# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CARMEN QUINTANA-DIEPPA,

    **Plaintiff,**

    **v.**

**DEPARTMENT OF THE ARMY,**

    **Defendant.**

Civil No. 19-1277 (ADC)

## OPINION AND ORDER

    Before the Court is defendant the Department of the Army's ("the Army" or "defendant") motion for summary judgment and plaintiff Carmen Quintana-Dieppa's ("Quintana" or "plaintiff") opposition thereto. **ECF Nos. 93, 110.** For the reasons below, the Army's motion for summary judgment is **GRANTED.**

### I. Background

    Quintana, a 62-year-old female, filed suit against the Army on March 28, 2019. She lodged claims of age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"), sex and racial discrimination under Title VII of the Civil Rights Act ("Title VII"), and retaliation in violation of Title VII and the Fair Labor Standards Act ("FLSA").[1] **ECF No. 1.** *See also* 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000 *et seq.*; 29 U.S.C. § 215(a)(3). Quintana also alleged she was subjected to a hostile work environment due to her gender in violation of Title VII. **ECF No. 1** at 11.

---

[1] Additional claims have already been dismissed by the Court. *See* **ECF No. 24.**

Quintana's suit stems from seven alleged incidents that are purportedly adverse actions suffered by her and taken by the Army out of a discriminatory or retaliatory animus in violation of ADEA, Title VII and the FLSA. These are:

1. An e-mail sent to Quintana by a supervisor recommending she apply for an open position at a different Army base. **ECF No. 1** at 8.

2. A performance evaluation given to Quintana by a supervisor in which she received a lower grade than she had in previous evaluations. *Id.*

3. Quintana's supervisor's failure to provide her with performance standards. *Id.*

4. Denial of a promotion Quintana had requested. *Id.*

5. Placing Quintana on leave and transferring her to another position. **ECF No. 1** at 9.

6. A text message sent to Quintana by a supervisor questioning her absence from work on a specific date. *Id.*

7. An incident in which Quintana was asked to report to work while on leave and then told to go home once she arrived. *Id.*

Now, the Army moves for summary judgment, maintaining *inter alia* that Quintana cannot establish – even in a *prima facie* manner – that the Army acted with a discriminatory or retaliatory animus in any of the above-mentioned incidents.[2]

---

[2] The Army also argued Quintana failed to exhaust administrative remedies, but it misses the mark. That argument was likely waived because the EEOC reached the merits of Quintana's charge without noting its tardiness, and the Army did not raise it earlier. *See Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino,* 410 F.3d 41, 45 (1st Cir. 2015).

## II. Summary Judgment Standard

Through summary judgment, courts "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992). The Supreme Court encourages employing summary judgment in federal courts – it "[avoids] full blown trials in unwinnable cases, … [conserves] parties' time and money, and [permits] the court to husband scarce judicial resources." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314 (1st Cir. 1995). *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A court may grant summary judgment only when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir. 2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *See Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004). The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Anderson Plumbing Productions Inc.*, 530 U.S. 133, 135 (2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of a jury, not of a judge. *See id.*

In short, when there is a genuine dispute as to any material fact, and when a court would be required to make credibility determinations, weigh the evidence, or draw legitimate

inferences from the facts in order to adjudicate a controversy, summary judgment will not be granted. While no legitimate inferences can be drawn, the court will construe all reasonable inferences in favor of the nonmoving party. *See Stoutt v. Banco Popular de Puerto Rico*, 158 F. Supp. 2d 167, 171 (D.P.R. 2001). Still, the nonmoving party is required to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

### III. Preliminary Matters

At the threshold, the Court must stop to address some fatal shortcomings in Quintana's opposition to defendant's motion for summary judgment. **ECF No. 110**. When responding to a motion for summary judgment, parties must abide by certain rules. For example, parties must set forth any proposed uncontested material facts (or rebukes thereto) in numbered paragraphs neatly containing the facts in question, devoid of argumentation and accompanied by specific citations to record materials of evidentiary value that either prove a proposed fact or disprove an opposed one. *See* Fed. R. Civ. P. 56; D.P.R. L. R. 56. Quintana has glaringly failed to comply with this rule, and others as well.

Under Local Rule 56(c):

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment… Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule…

D.P.R. L. R. 56(c). If a party improperly controverts the facts, the court may treat those facts as uncontroverted. *See Natal Pérez v. Oriental Bank & Tr.,* 291 F.Supp.3d 215, 219 (D.P.R. 2018). Litigants who ignore the rule do so "at their peril." *Puerto Rico American Ins. Co. v. Rivera–Vázquez,* 603 F.3d 125, 131 (1st Cir. 2010). Furthermore, the Court "shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D.P.R. L.R. 56(e). *See also Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH,* 781 F.3d 510, 521 (1st Cir. 2015) (noting that failure to comply with the standards of Local Rule 56 by the nonmovant allows the district court to accept the moving party's facts as stated).

Quintana opposed or qualified defendant's statements of uncontested material fact ("**DSUMF**s") **8, 14, 28, 29, 31, 33, 37, 38, 39, 46, 47, 51, 54, 57, 60, 61, 62, 63, 67, 75, 76, 85, 89, and 90**. *See* **ECF No. 110-1, Plaintiff's Opposing Statement of Facts** ("**POSF**"). However, the only qualification that comes close to succeeding (albeit partially) is that to **DSUMF 60**, in which the Army posits that plaintiff was not functionally denied a promotion and Quintana responds that she requested a promotion, but her request was denied, and submits deposition testimony to that effect. *See* **PSOF 60.** All other oppositions refer to record citations that do not lend support to Quintana's propositions (**POSF 8, 28, 29, 31, 33, 38, 47, 51, 57, 61, 62, 63, 67, 85**), include propositions that do not contradict the Army's **DSUMF**s (**POSF 8, 29, 31, 33, 37, 38, 39, 51, 54, 57, 61, 67**), or forego citations to the record altogether (**POSF 14, 46, 75, 76, 89, 90**).

For example, **DSUMF 8** states that Quintana was the subject of an investigation. However, Quintana's opposition at **PSOF 8** states only that Quintana "did not know" she was one of the subjects of the investigation and then cites six record materials that neither support that position nor contradict the underlying premise of **DSUMF 8**. Similar problems permeate Quintana's entire opposition. As far as the Court can tell, Quintana copy-pasted the same four record citations throughout most of her oppositions without regard to the matters asserted. To boot, in **PSOF**s **31** and **33,** Quintana egregiously mischaracterizes a witness's testimony.[3] Such a transgression, be it by design or out of carelessness and ignorance, is beyond the pale.

For all the foregoing, Quintana fails to properly contest the Army's proposed uncontested material facts (except **DSUMF 60**, and then only partially).

Furthermore, Quintana attempts to add facts by way of her oppositions, and even admissions, of the Army's **DSUMF**s. For example, Quintana admits **DSUMF 1**, and then includes a full paragraph with additional – and unsupported – facts. **PSOF 1**. Quintana attempts to include similar additional facts throughout her opposition. However, additional facts must be put forward in a separate section, and "set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule." D.P.R. L. R. 56(c). "This separate section containing additional facts is necessary to allow the moving party to reply to

---

[3] There, plaintiff cites the witness as stating that plaintiff's reassignment "had nothing to do" with the results of an investigation the Army conducted (generally alluded to as "AR-15") – but the witness actually stated that an unrelated Army regulation (generally alluded to as "Regulation 215") had "nothing to do with the [investigation]." *Compare* **PSOF**s **31** and **33** *with* **ECF 110-7** at 65-66. Both plaintiff's reassignment and the investigation will be discussed in detail below.

those additional facts and to allow the court to easily determine the disputed facts." *Malavé-Torres v. Cusido*, 919 F. Supp. 2d 198, 207 (D.P.R. 2013). A party thus may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts. *See Acevedo–Parrilla v. Novartis Ex–Lax, Inc.*, 696 F.3d 128, 137 (1st Cir. 2012) (citing *Carreras v. Sajo, García & Partners*, 596 F.3d 25, 32 (1st Cir. 2010) (rejecting argument that Local Rule 56(c) does not require separate section for additional facts)). *See also Malavé-Torres*, 919 F.Supp.2d at 207 (nonmoving party "may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts."). As such, per Local Rule 56, all additional facts set forth within plaintiff's opposition of the Army's **DSUMF** shall be disregarded.

Quintana did include additional facts in a separate section. *See* **ECF No. 110-1** at **27-31**. Yet, she did not set forth these additional facts in separate numbered paragraphs, as required by Local Rule 56(c). *Id.* The government, understandably, complained. **ECF No. 132**. The Court should therefore ignore these additional facts because of the undue burden they place upon the Army and the Court. Still, even if the Court considered them, they are by-and-large irrelevant and would not tilt the needle in a different direction.

The Court notes that this is not the first time the Court has needed to call attention to plaintiff's counsels' performance or conduct in this case. **ECF No. 155** ("Plaintiff clearly warned that the next filing containing unsubstantiated allegations, innuendos or mischaracterizations of the record, opposing counsel's posture or allegations will be directly addressed by the imposition of economic sanctions or other measures."); **ECF No. 148** ("particularly plaintiff's

counsel who in spite of previous orders of the Court continues to make unfounded allegations, mischaracterizations and introducing irrelevant facts that affect camaraderie"); **ECF No. 127** ("Plaintiffs failed to appear at today's status conference and the courtroom deputy attempted but remained unable to contact counsel. Defendants waited for 1 hour and the conference was adjourned."); **ECF No. 108** ("In light of recent events that have transpired in the case, attorneys of record were strongly admonished, and the Court will not allow any mischaracterization on pending matters be brought forth within the contents of the documents to be submitted for the Court's consideration.").[4]

### IV. Factual Findings

In accordance with the foregoing, the Court finds that the following material facts are uncontested:

#### i. Quintana's first complaint with the EEOC:

Quintana was employed by the Army as a Child Youth and School Services ("CYSS") Coordinator at Fort Buchanan in Puerto Rico. **DSUMF 1**. In September of 2014, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she had been discriminated against on the basis of her national origin. **DSMUF 2**. An administrative judge entered judgment in favor of the Army in July of 2017. **DSUMF 5**.

---

[4] The Court also notes that plaintiff's submitted exhibits are not properly organized. The exhibits are not numbered, and the titles used do not match up with the titles referred to throughout the **POSF**. The pages of the depositions filed are out of order, as well. *See* **ECF Nos. 110-6** and **110-7**. This only makes it harder for the Court to do its job. In addition, the Court respectfully requests that counsels for the plaintiff avoid abusing bold and italic characters, since it does not augment plaintiff's arguments. *See inter alia* **ECF Nos. 110, 110-1**.

### ii. First Investigation:

Following allegations of mismanagement and poor work conditions, the 81st Regional Support Command, based in Fort Jackson, South Carolina, initiated an investigation into Fort Buchanan's Family and Morale, Welfare and Recreation ("FMWR") Division in May of 2016. **DSUMF 7**. Quintana, along with the FMWR supervisory chain, was one of the subjects of that investigation.[5] **DSUMF 8**. Upon completion of the investigation, the investigating officer found that Quintana did "not always treat subordinates with dignity and respect or foster a healthy command climate" and that her "authoritative and brash leadership style [had] fostered a toxic work environment." **DSUMF**s **11** and **12** (*quoting* **ECF No. 94-3** at 13). The Commanding General at Fort Jackson accepted the results of the investigation but did not act upon them – instead, he forwarded them to the Garrison Commander at Fort Buchanan. *Id. See also* **DSUMF 13**.

### iii. Follow-Up Investigation:

Fort Buchanan's Garrison Commander, COL Michael T. Harvey ("COL Harvey"), after receiving the results of the investigation, requested a second investigation be conducted into Quintana's treatment of her subordinates. **DSUMF**s **15** and **16**. That follow-up investigation began in late August of 2016 and concluded a little over a month later, in early October. **DSUMF**

---

[5] Specifically, issue #7 of the investigation asked whether Quintana had "violated [Army regulations] by not treating her subordinates with dignity and respect, characterized by harassing, threatening or intimidating behavior and language with specific instances of abuse of authority, disrespect, threats, fear tactics, favoritism, intimidation and retaliation?" **DSUMF 9** (*quoting* **ECF No. 94-3** at 9).

**15**. The investigating officer, after gathering sworn statements and documentary evidence (**DSUMF 24**), made the following findings:

1. Twenty-seven individuals "confirmed" being the object of or witnessing "disrespectful or disparaging behavior by Ms. Quintana." **DSUMF 17** (*quoting* **ECF No. 94-4** at 2).

2. "Favoritism, Disrespect, Intimidating language/behavior, and Retaliation were most prominent." *Id.*

3. "About half of CYSS' [sic] workforce rated Ms. Quintana's leadership unfavorably." **DSUMF 18** (*quoting* **ECF No. 94-4** at 2).

4. "Personnel leave and staffing is poorly addressed and managed." **DSUMF 19** (*quoting* **ECF No. 94-4** at 3).

5. "There is a hostile and tense work environment at CYSS. Employees are afraid of [Quintana]. Quintana controls everything, stifles employees' initiative. **DSUMF 20** (*quoting* **ECF No. 94-4** at 4).

6. Quintana "micromanages CYSS" and "gets personally involved in a myriad [of] inordinate matters that should be instead addressed by her subordinate directors." **DSUMF 21** (*quoting* **ECF No. 94-4** at 4).

7. "Ms. Quintana treated her employees with lack of dignity and respect." **DSUMF 22** (*quoting* **ECF No. 94-4** at 5).

8. "The pattern of misconduct warrants disciplinary action." **DSUMF 23** (*quoting* **ECF No. 94-4** at 6).

*iv. The Reassignment:*

After receiving the results of the second investigation, COL Harvey, Fort Buchanan's Garrison Commander, signed off on a letter of reassignment to be issued to Quintana on January 25, 2017 by her then supervisor, Daniel Carter ("Carter"). **DSUMF 27**. However, two days earlier, President Donald J. Trump issued a hiring freeze that was not lifted until April 12, 2017. **DSUMF**s **28** and **29**. For that reason, the letter of reassignment's issuance was delayed. *Id.*

In June of 2017, Carter (Quintana's supervisor) vacated his position as FMWR Programs Director (and as Quintana's supervisor) and was replaced by Todd Scalf ("Scalf"). **DSUMF**s **26**, **30** and **37.** Scalf reviewed the files pertaining to the aforesaid investigations and thereafter signed a revised letter of reassignment, transferring Quintana to a newly created position with the same pay and grade. **DSUMF**s **31** and **32**. The letter of reassignment specified that the "justification for this action is that management has serious and substantiated concerns about your management style, which is not conductive to an adequate child care [sic] environment" and then noted several of the findings in the investigation reports. **DSUMF**s **33**, **34** and **35**. The letter was issued to Quintana at a meeting on November 17, 2017. **DSUMF 36**. She was placed on a one-day administrative leave immediately after the meeting. **DSUMF 64**; **ECF 94-5** at 196.

During January of 2018, Wendy Winston ("Winston") – who is a Hispanic female – took on Quintana's duties temporarily. **DSUMF 38**. Then, on January 31, 2018, Aida Aguilú ("Aguilú") was named *Acting* CYSS Coordinator. *Id.* A year later, Aguilú was formally selected

to fill the role on a permanent basis. **DSUMF 39**. Aguilú is a Hispanic female and is only about

a year and two months younger than Quintana. **DSUMF**s **40** and **41**.

### v. E-Mail Re: Position in Maryland

Carter forwarded Quintana an e-mail in June of 2016 regarding an open CYSS

Coordinator position in Maryland.[6] **DSUMF 46**. Carter said he forwarded the posting because

Quintana had expressed numerous times she wanted to leave Fort Buchanan, "that she had too

much on her plate, her health was doing well and the job was becoming stressful." **DSUMF 47**.

### vi. Unfavorable Performance Evaluation

In January of 2017, Quintana received a performance evaluation for the period of July 1,

2015 to June 30, 2016. **DSUMF**s **48** and **49**. Carter rated her performance as "satisfactory,"

because she had met certain standards but had not expanded the youth sports and youth school

programs. **DSUMF**s **49** and **50**. Carter noted that these programs were "weak." **DSUMF 51**. In

her previous evaluation (for the period of July 1, 2014 to June 30, 2015), Quintana's performance

had been rated as "outstanding." **DSUMF 52**. Quintana stated, under oath, that it was "obvious"

that the lower rating was "tied to the 15-6 [investigation] results and professional jealousy."

**DSUMF 53**.

### vii. Performance Standards Not Provided

Quintana alleges that no performance standards or appraisals were issued to her for the

period starting in July 2016 and ending in June 2017. **DSUMF 54**. Carter testified that during his

---

[6] The content of the e-mail is included at fn.19.

time as the acting Program Director of FMWR, neither Quintana, nor any of the fifteen employees Carter supervised received new performance standards. **DSUMF**s **55** and **56**. At least three other employees did not receive performance appraisals for the same time period. **DSUMF 57**. *See also* **ECF No. 94-5** at 203-204. Carter acknowledged that the missing performance reviews were a failure of his supervisory role, due to a heavy workload and an understaffed department. **DSUMF 56**

### viii. Promotion Refusal

In May of 2017, Quintana informed Carter she had reviewed a version of the CYSS manning document and believed that, based on that document, she needed to be non-competitively promoted to a NF-05 Coordinator position – despite that the manning document constituted preliminary guidance issued in advance of any mandate by the U.S. Army Installation Management Command ("IMCOM") G-9 (which commands FMWR and CYSS). **DSUMF**s **61** and **62**. Carter did not submit an electronic request for personnel action promoting Quintana to the position she had requested because Fort Buchanan's CYSS program did not fit the demographics required for that position by the Army NAF Standardized Position Description. **DSUMF 63**.

### ix. November 2017 Text Message

On November 20, 2017, Scalf sent Quintana a text message asking about her whereabouts because she had not reported for work that day.[7] **DSUMF 64**. Quintana perceived the message

---

[7] The content of the text message is included at fn.20.

as disrespectful. **DSUMF 65**. The record does not indicate that Quintana was on preapproved leave or otherwise notified Scalf that she would be taking sick leave before he contacted her by text message. **DSUMF 66**.

### x. January 2018 Incidents

On January 4, 2018, Scalf sent Quintana a "report to work" text message. **DSUMF 68**. On January 5, Quintana explained to Scalf that she was on leave through that day. **DSUMF 69.** Scalf believed, erroneously, that Quintana's leave had concluded on January 3 because of a mix-up with the leave documents. **DSUMF**s **68, 69** and **71**. Upon noticing his mistake, Scalf sent Quintana home. **ECF No. 94-5** at 194.

### V. Discussion

Plaintiff lodges claims of age discrimination pursuant to ADEA, gender and racial discrimination pursuant to Title VII, and retaliation in violation of Title VII and the FLSA. The Court will first address plaintiff's claims of age, gender and racial discrimination under ADEA and Title VII.

### 1. ADEA and Title VII Discrimination

ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446 (1st Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). The Supreme Court has clarified that, regardless of whether direct or circumstantial evidence is

used to support an ADEA claim, and of whether a burden shifting analysis is employed by the court, plaintiffs must "establish that age was the 'but for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 (2009). Notwithstanding, there is no "heightened evidentiary requirement" for plaintiffs to satisfy their burden of persuasion through "direct evidence" as opposed to "circumstantial evidence." *Id*. at 2351 n. 4. The rule is simply that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but for' cause of the challenged employer decision." *Id*. (*citing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 143, 147 (2000)).

Title VII, which prohibits discrimination because of sex and nationality, provides "that '[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (*citing* 42 U.S.C. § 2000e− 2(a)(1)).)

In the absence of direct or "smoking gun" evidence, ADEA plaintiffs may nonetheless prove their cases by using the three-stage burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Meléndez v. Autogermana, Inc*., 622 F.3d 46, 50 (1st Cir. 2010). Title VII discrimination claims too are "ordinarily subject to the familiar *McDonnell Douglas* burden-shifting framework." *Caraballo-Caraballo v. Corr. Admin*., 892 F.3d 53, 57 (1st Cir. 2018). *See also Cruz v. Mattis*, 861 F.3d 22, 25 (1st Cir. 2017); *Henderson v. Massachusetts Bay Transportation Auth*., 384 F. Supp. 3d 199, 204 (D. Mass. 2019), aff'd, 977 F.3d 20 (1st Cir. 2020).

Per the burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination. *See Thermo King*, 585 F.3d at 447-48. After the *prima facie* showing is made, the burden then shifts to the employer to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *Id.* If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but rather a pretext for discrimination. *Id.* "Where, as here, a plaintiff opposing summary judgment does not have direct evidence of discrimination, we apply the burden-shifting framework." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021).

A. *Prima Facie Case*

The Army argues that Quintana cannot establish a prima facie case of discrimination. While "only a minimal evidentiary showing is necessary to satisfy an employee's burden of production at this stage," *Torrech Hernández v. General Elec. Co.*, 519 F.3d 41, 49 (1st Cir. 2008), Quintana has not hit that mark here with regards to her age, sex and racial discrimination claims.

The Court will address each adverse action individually.[8]

---

[8] The Court will not discuss (a) the e-mail Carter sent to Quintana, (b) the text message Scalf sent Quintana telling her to report to work on a day she was absent, and (c) an incident in which Quintana was mistakenly told to report to work while on leave and then sent home when the mistake was discovered, because they are not adverse actions. *Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 (1st Cir. 2017) ("An adverse employment action is one that affects employment or alters the conditions of the workplace."). Adverse acts "typically involve discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012). "Petty slights or minor annoyances that often take place at work and that all employees experience fall outside the scope of the anti-discrimination laws." *Natal Pérez v. Oriental Bank & Tr.*, 291 F. Supp. 3d 215, 235 (D.P.R. 2018). This applies to ADEA and Title VII claims. *Id.* at 226. Even if these three incidents were adverse

*i. The Transfer*

Involuntary transfers to less desirable positions are often treated as constructive discharges. *Lebofsky v. City of Philadelphia*, 394 F. App'x 935, 939 (3d Cir. 2010). In cases where an employer is not conducting a reduction in force, a plaintiff can establish a *prima facie* claim of discrimination by showing that: (1) they were part of a protected group; (2) they met the employer's legitimate job performance expectations; (3) they experienced an adverse employment action; and (4) the employer had a continuing need for the services provided previously by the plaintiff. *See Velázquez-Fernández v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir. 2007); *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000).

Quintana was involuntary transferred to a less desirable position. **DSUMF**s **31**, **32 36**.

"When determining whether an employee's performance met the employer's legitimate expectations, an employee's perception of himself is not relevant. Rather, it is the perception of the decision maker which is relevant." *Navedo v. Nalco Chemical, Inc.*, 848 F.Supp.2d 171, 193 (D.P.R. 2012) (cleaned up). Quintana has not pointed to record materials, nor otherwise made an evidentiary showing, that she met the employer's legitimate job performance expectations. *See Velázquez-Fernández*, 476 F.3d at 11. On the other hand, the Army has flooded the record with materials of evidentiary value that support the proposition that Quintana was not meeting her

---

actions, they could not carry a discrimination claim here – Quintana does not demonstrate that these actions constituted disparate treatment, were taken out of a discriminatory animus or were curtained by pretextual justifications. Thus, the ADEA and Title VII claims as pertain to these three incidents are **DISMISSED WITH PREJUDICE**.

employer's legitimate job expectations in several ways. *See* **DSUMF**s **11** and **12** (stating that Quintana's leadership style was authoritative and brash, and she had fostered a toxic work environment); **17**, **18, 19, 20, 21, 22,** and **23** (describing deficiencies in Quintana's leadership, such as exhibiting disrespectful and disparaging behavior towards employees and poor management); **33, 34, 34,** and **35** (management had "serious and substantiated concerns" regarding Quintana's management style, which was termed to not be "conductive to an adequate child care [sic] environment"); **50** (Quintana had not expanded the youth sports and youth school programs); and **51** (the programs headed by Quintana were noted as "weak")**.** And, as aforenoted, Quintana failed to contest or challenge the cited **DSUMF**s. Even with "the minimal evidentiary showing [that] is necessary to satisfy an employee's burden of production at this stage," the omission is glaring and likely fatal. *Torrech Hernández*, 519 F.3d at 49.

Instead, Quintana relies on stating, without more, in her response to the Army's motion for summary judgment, that Quintana had worked for the Army for over 30 years "and no prior history [of prior poor performance or admonishments.]" **ECF 110** at 7. Such a statement, unsupported by record materials and unsubmitted as a material fact, is inconsequential at the summary judgment stage. Quintana's 30 years of employment and accompanying performance record were not submitted as material facts to the Court, and Quintana did not reference record materials to that effect. The First Circuit has held "with a regularity bordering on the monotonous that parties ignore the strictures of an 'anti-ferret' rule at their peril." *Rivera–Vázquez*, 603 F.3d at 131.

In *Woodman*, the Court found that a plaintiff had "cleared [the *McDonnell Douglas* prima facie] hurdle with his proffer of substantial wage increases and ten years of positive performance reviews, blemished by but one negative performance evaluation five days prior to the reduction in force." *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1092 (1st Cir. 1995) (*citing Woods v. Friction Materials, Inc.*, 30 F.3d 255, 261 (1st Cir. 1994) (history of largely favorable performance reviews and extensive experience in industry adequate to generate at least a genuine issue as to plaintiff-employee's ability to meet legitimate job expectations)). A similar *evidentiary* proffer is absent here. [9] Quintana, unlike the *Woodman* plaintiff, cannot clear the hurdle on the record presently before the Court.

Notwithstanding, the First Circuit Court of Appeals has consistently held that "we cannot consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Autogermana*, 622 F.3d at 51 (*citing Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir.2 003)). *See also Thermo King*, 585 F.3d at 448 (finding as error that the district court "accepted for the purpose of the *prima facie* analysis [the employer's] stated reason for firing [the plaintiff] as proof that he was not qualified for the … job"). The situation here is different, however, because Quintana has not made *any showing at all* as to whether she was meeting her employer's legitimate expectations. So, rather than accepting

---

[9] The Army submitted an uncontested statement of material fact that Quintana received an "outstanding" performance review for the period of July 1, 2014 to June 30, 2015. However, evidence of a single favorable performance review is not enough to meet even the low standard set forth in *Woodman*. If there is more evidence of favorable performance reviews in the record, Quintana has failed to adequately call the Court's attention to them. *See Rivera–Vázquez*, 603 F.3d at 131 ("parties ignore the strictures of an 'anti-ferret' rule at their peril").

the Army's stated reasons for transferring Quintana, the Court is instead holding simply that

Quintana failed to satisfy even the low burden placed upon her by the *McDonnell Douglas*

framework at the *prima facie* step. *See Torrech Hernández*, 519 F.3d at 49 (a "minimal evidentiary

showing is necessary to satisfy an employee's burden of production at this stage").

Still, the Court will run Quintana's discrimination claims pertaining to the involuntary

transfer through the *McDonnell Douglas* gamut, if only for the sake of ensuring that Quintana's

performance record was not tarnished by the Army as a pretext to enable a liability-free transfer.

*ii. The Performance Evaluation and the Performance Standards*

With regards to the "satisfactory" performance evaluation she received in January of

2017, **DSUMF**s **48** and **49**, and Quintana's claim that no performance standards or appraisals

were issued to her for the period starting in July 2016 and ending in June 2017, **DSUMF 54**, the

litmus test for a *prima facie* case changes. To establish a disparate treatment case here, Quintana

must show that she was treated more severely, or at least not class neutrally, as compared to

others similarly situated and outside her age, sex or race protected classes. *See* 6 Emp. Coord.

Employment Practices § 57:20; *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93-94 (1st Cir. 2012).

Quintana did not submit any record materials to form a minimal showing that her lower

than usual performance review was discriminatory in any fashion or that similarly situated

employees not belonging to her age, sex or race protected classes were graded more favorably.

In fact, Quintana instead stated, under oath, that it was "obvious" that the lower rating was

"tied to the 15-6 [investigation] results and professional jealousy." **DSUMF 53**. Even taking these

superficial averments as true, such reasons are unrelated to discrimination based on age, sex, or race under the purview of ADEA and Title VII. *See* 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000 *et seq.* Accordingly, Quintana has failed to establish a *prima facie* case of discrimination regarding her ADEA and Title VII claims with respect to the performance evaluation.

Quintana's assertion that no performance standards or appraisals were issued to her for the period starting in July 2016 and ending in June 2017 fares no better. Here, Quintana continues the trend of not submitting record materials to form a minimal showing in support of a *prima facie* case of discrimination. Quintana does not contend or point to evidence that indicates that similarly situated employees not belonging to her age, sex or race protected classes were provided performance standards. This is fatal to her attempt at formulating a *prima facie* ADEA and Title VII discrimination case with regards to the performance standards that were not provided to her. Moreover, it is uncontested that, besides Quintana, a number of employees under Carter's supervision did not receive performance standards or appraisals during the relevant time period. **DSUMF**s **54, 55** and **56**. Quintana accordingly fails.

   *iii. Promotion Denial*

Quintana requested a promotion, but her request was denied, and she submits deposition testimony to that effect. *See* **DSUMF 60; PSOF 60.**

To satisfy the *prima facie* burden of ADEA and Title VII failure to promote claims, Quintana must show that: "(1) she is a member of a protected class; (2) she was qualified for the promotion; (3) she was rejected; and (4) that other similarly or less qualified employees, who

were not members of the protected class, were promoted." *Rodríguez-Torres v. Gov't Dev. Bank of Puerto Rico*, 704 F. Supp. 2d 81, 95 (D.P.R. 2010) (cleaned up). "In ADEA claims, the [p]laintiff must also show that the person promoted instead of [p]laintiff was significantly younger than [p]laintiff and had similar qualifications." *Id.* (*citing O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)).

Quintana cannot successfully establish a *prima facie* showing of discrimination on her failure to promote claims because she does not point to evidence in the record showing that anybody was promoted, much less somebody similarly or less qualified to Quintana who was outside of her age, sex, or race protected groups. Quintana has accordingly failed to establish a *prima facie* showing of discrimination on her failure to promote claims. Quintana has also failed to submit evidence that she was qualified for the promotion, or that the position she sought even existed at Fort Buchanan.[10] She, thus, has not established a *prima facie* case of discrimination as it pertains to her failure to promote claims.

B. *Burden shift*

For the sake of thoroughness, the Court notes that even if Quintana had established a *prima facie* showing of discrimination regarding all the aforementioned claims, her ADEA and Title VII claims would still fail because her claims would falter in the later stages of the *McDonnell Douglas* burden-shifting framework.

---

[10] It is uncontested that Fort Buchanan's CYSS program did not fit the demographics required by the Army NAF Standardized Position Description for the position Quintana sought. **DSUMF 63.**

As the First Circuit set forth in *Thermo King*, if the plaintiff establishes a *prima facie* showing of age based discrimination, the court proceeds as follows:

> The burden of production then shifts to the employer to articulate a legitimate, non discriminatory reason for its decisions. If the employer articulates such a reason, the *McDonnell Douglas* framework with its presumptions and burdens is no longer relevant. At this stage, the sole remaining issue is discrimination *vel non*. A plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

585 F.3d at 447-48 (cleaned up).

The Army moved evidence into the record that Quintana was transferred (and placed on a one-day administrative leave that was incidental to the transfer) because "management ha[d] serious and substantiated concerns about [her] management style, which is not conductive to an adequate child care [sic] environment" and then noted several of the findings in the reports of two investigations conducted by the Army into Quintana's conduct and performance. **DSUMF**s **33**, **34, 35** and **36**. The Army also pointed to record materials that showed that Quintana had received a lower-than-usual performance review because she had met certain standards but had not expanded the youth sports and youth school programs, which were also noted as "weak." **DSUMF**s **49, 50** and **51**. With regards to the performance standards and appraisals that were not provided for the June 2016-June 2017 period, the Army pointed to evidence explaining that the missing performance standards and appraisals were a failure on Carter's part as supervisor and were a widespread deficiency within his department due to a heavy workload and understaffed department. **DSUMF 56**. With regards to Quintana's failure to promote claims, the

Army produced evidence on record to prove that Carter did not promote Quintana because Fort Buchanan's CYSS program did not fit the demographics required by the Army NAF Standardized Position Description for the position that Quintana believed she was entitled to a promotion for. **DSUMF 63**. Thus, the Army has successfully established legitimate, non-discriminatory reasons for its decisions. *See Thermo King*, 585 F.3d at 447.

   *C. Pretext*

   The Court therefore now moves to the third and final step of the *McDonnell Douglas* framework, where the burden is on plaintiff to show that defendant's asserted reason for its decisions was a pretext for discrimination. *See Santangelo v. New York Life Ins. Co.*, 785 F.3d 65, 70 (1st Cir. 2015). "To meet that burden, '[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive.'" *Santangelo*, 785 F.3d at 70 (1st Cir. 2015) (*citing Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gómez González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-663 (1st Cir.2010) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).

*i. The Transfer and One-Day Leave*

Quintana fails to point to anything in the record that comes close to a showing that the Army's proffered and substantiated reasons for the November 2017 involuntary transfer to a less desirable position (and one-day administrative leave that was incidental to the transfer) were a pretext to hide a discriminatory animus. In her opposition to the Army's **DSUMF** and in her additional statement of facts, Quintana cites a witness as stating that plaintiff's reassignment "had nothing to do" with the results of a AR-15[11] investigation – but the witness actually stated that "regulation 215"[12] had "nothing to do with the AR 15-6." *Compare* **PSOF**s **31** and **33; ECF No. 110-1** at 30 *with* **ECF 110-7** at 65-66. Similarly, statements to the effect that Carter did not know why Quintana was transferred and placed on a one-day leave are irrelevant because she has not established that he was involved in the decision to transfer her in the first place. *See* **ECF No. 110-1** at 30. The fact that Scalf and Army leadership relied, in part, on the results of the second investigation into Quintana's performance and conduct to transfer her and place her on an incidental one-day leave (even if the investigation report did not specifically recommend the transfer and Scalf did not recall the specific recommendations at his deposition) is also unavailing to a showing of pretext. *See id.*[13] Indeed, the letter of reassignment stated that "management ha[d] serious and substantiated concerns about [her] management style, which is

---

[11] "AR-15" is a classification of investigation employed by the Army – such as the 2016 investigation into Quintana and several others.

[12] Regulation 215 is an unrelated Army regulation. It has no bearing on the Court's holding.

[13] The additional facts relied on by Quintana to make these assertions need not even be considered by the Court, as she did not comply with Local Rule 56 when submitting them. Still, as discussed herein, they do not aid her.

not conductive to an adequate child care [sic] environment" and then noted several of the findings in the reports of two investigations conducted by the Army into Quintana's conduct and performance. **DSUMF**s **33**, **34, 35** and **36**. As such, the Army does not contend that Quintana was transferred as a direct result of the recommendations of the second investigation, but rather due to "serious and substantiated concerns" that were vindicated by the investigation's results.

Furthermore, the Army entered into evidence record materials stating that the appointing authority (in this case Army leadership at Fort Buchanan) is "neither bound, nor limited, by the findings or recommendations of an investigation." **ECF Nos. 94** at 4 and **94-27** at 15. To boot, the first investigation's recommendations called for Quintana's transfer. **ECF No. 94-3** at 15. *See also Webber v. Int'l Paper Co.*, 417 F.3d 229, 238 (1st Cir. 2005); *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 537 (1st Cir. 1996) ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.") (*quoting Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)). In the end, Quintana did not submit any record materials to suggest that her transfer was in any way discriminatory,[14] to

---

[14] Quintana does submit an additional fact stating that Roberto Medina ("Medina"), a male, was interviewed to fill her former position at some point after April 2018, and was offered the job but he rejected the offer. **ECF 110-1** at 29. However, Quintana does not enter evidence into the record regarding Medina's age, race or qualifications. Still, as pertains to Quintana's sex discrimination case, that Medina emerged as a leading candidate does not sway the Court. By the time Medina was even considered, Quintana's former position had already been occupied for months by women, and one was ultimately chosen to fill it permanently. In ADEA cases, plaintiffs must "establish that age was the 'but for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 (2009). Notwithstanding, and as the Court has noted multiple times, it need not consider Quintana's statement of additional facts because they were improperly submitted to this Court. *See* D.P.R. L. R. 56.

contradict the version of events presented by the Army, or that the Army's decisions hide behind

pretexts. The cupboard is truly bare.

Quintana also references in her response to the Army's motion for summary judgment,

in passing, that "comments made by supervisors implied she was too old to continue and sought

to exclude [her]." **ECF No. 110** at 8. However, Quintana did not submit these alleged comments

for the Court's consideration. Thus, for summary judgment purposes, they do not exist. *See*

D.P.R. L. R. 56. *See also Rivera–Vázquez*, 603 F.3d at 131.

Quintana accordingly does not meet her burden to "elucidate specific facts which would

enable a jury to find that the reason given is not only a sham, but a sham intended to cover up

the employer's real motive," *Santangelo*, 785 F.3d at 70, or proffer record materials that evince

"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them unworthy of credence and hence infer that the employer did not act for the

asserted non-discriminatory reasons." *Gómez González*, 626 F.3d at 662-663.[15] Quintana has thus

failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue

persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

"In a case where the first two steps of the *McDonnell Douglas* pavane have been

satisfactorily choreographed, a plaintiff must offer some minimally sufficient evidence, direct

---

[15] In addition, the Army has established that Dieppa was replaced first for one month by a Hispanic woman, and later permanently by a Hispanic woman of a similar age. **DSUMF**s **38, 39, 40** and **41**.

or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).

Quintana's ADEA and Title VII discrimination claims pertaining to her transfer and one-day administrative leave therefore fail. They are **DISMISSED WITH PREJUDICE.**

### ii. Other Adverse Actions

The Court now turns to the other adverse events alleged by Quintana. As to them, Quintana does not even formulate a clear attempt to demonstrate that the Army's stated, legitimate reasons were pretextual. Where the standard is to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive," *Santangelo*, 785 F.3d at 70, or proffer record materials that evince "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons," *Gómez González*, 626 F.3d at 662-663, the lack of an articulated attack on the Army's proffered reasons is fatal.[16] Quintana has thus failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

---

[16] To the extent that the discussion in the previous section may be relevant here, it is incorporated by reference.

As such, a showing of pretext cannot be sustained. *See Mesnick*, 950 F.2d at 825. For the foregoing reasons, Quintana's claims of discrimination under ADEA and Title VII are **DISMISSED WITH PREJUDICE**.

   2.   *Hostile Work Environment*

The Army moves for summary judgment dismissing Quintana's claims that she was subjected to a hostile work environment on the basis of her sex in violation of Title VII. The Army argues that summary judgment should be granted on Quintana's hostile work environment claim because "the 'harrasment' she complains of comes nowhere close to being objectively severe or pervasive under binding precedent." **ECF No. 93-1** at 3-4. Quintana did not respond.

In her complaint, Quintana mentions that she "complained to management about the hostile work environment she experienced as a result of the verbally abusive harassment she was subjected to by a subordinate." **ECF 1** at 2. However, Quintana did not exhaust administrative remedies as to any incidents except the seven incidents listed above, *supra* at 2.[17] *See* **ECF No. 94-5** at 134-35. Quintana is thus barred from raising any claims unrelated to those

---

[17] These are, again: (1) An e-mail sent to Quintana by a supervisor recommending she apply for an open position at a different Army base; (2) A performance evaluation given to Quintana by a supervisor in which she received a lower grade than she had in previous evaluations; (3) Quintana's supervisor's failure to provide her with performance standards; (4) Denial of a promotion Quintana requested; (5) Placing Quintana on leave and transferring her to another position; (6) A text message sent to Quintana by a supervisor questioning her absence from work on a specific date; (7) An incident in which Quintana was asked to report to work while on leave and then told to go home once she arrived. **ECF No. 1** at 8-9.

seven incidents in federal court.[18] *Franceschi v. U.S. Dep't of Veterans Affs.*, 514 F.3d 81, 85 (1st Cir. 2008) ("Before an employee may sue in federal court on a Title VII claim, he must first exhaust administrative remedies."); *Labiosa-Herrera v. Puerto Rico Tel. Co.*, 153 F. Supp. 3d 541, 548 (D.P.R. 2016) (granting summary judgment on hostile work environment because plaintiff had failed to exhaust administrative remedies).

The Court has already ruled that four of the seven alleged incidents were nondiscriminatory. *See supra* at 16-27 (ruling that the transfer, the negative performance review, the non-issuance of standards and appraisals, and the failure to promote were not discriminatory). They cannot moor Quintana's Title VII hostile work environment claims because such claims must be premised on conduct that is discriminatory. *Hernández v. Gutierrez*, 656 F. Supp. 2d 101, 105 (D.D.C. 2009).

That leaves three events before the Court: (1) An e-mail sent to Quintana by a supervisor in June 2016 recommending she apply for an open position at a different Army base,[19] (2) a text message sent to Quintana by a supervisor in November 2017 regarding her absence from work

---

[18] Moreover, when asked to identify the instances of harassment she was subjected to, Quintana could not identify any instances. **DSUMF 73**.

[19] The e-mail read as follows:

> Hello Carmen, I was sent this link: [link]. Please don't take this as I am trying to get rid of you. I think it is important to stay competive. You have been here for 25 years and I think you would be great at a larger garrison. The DFMWR is very nice, compassion [sic] and supportive. Again, I am sending this to you because this could be a great opportunity for you and a new challenge if that is what you desire. I am a person that if I don't find a challenge, then I get complacent. You are not complacent but I know you like a challenge. BTW AOG is where Lillian is at. Thank you, Dan.

**ECF No. 94-5** at 216.

on a specific date,[20] and (3) an incident in which Quintana was asked to report to work in January 2018, while on leave, and then told to go home, upon her arrival, when the supervisor realized he was mistaken and unaware she was on approved leave.

A hostile work environment claim exists if a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *White v. N.H. Dep't of Corr.*, 221 F.3d 254, 259 (1st Cir. 2000). There is no "mathematically precise test" for determining if conduct reaches the threshold of being so severe or pervasive that it creates a work environment abusive to employees. *Torres-Santiago v. Alcaraz-Emmanuelli*, 617 F. Supp. 2d 26, 36 (D.P.R. 2009) (*quoting Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22–23 (1993)). To determine if a reasonable person would find a work environment hostile or abusive, a court must consider the totality of the circumstances. *See id.* Courts may look to factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id. See also Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir.2005).

The conduct underlying Quintana's hostile work environment claim does not satisfy the "severe or pervasive" threshold. For one, the incidents are infrequent, and months apart. A single e-mail was sent in June of 2016. **DSUMF 46.** Then, over a year later, in November 2017,

---

[20] The text read "where are you[?]" and "you [sic] supposed to be here today at 0800hrs, your sick leave request will not be approved…" **ECF No. 94-5** at 134.

she received a text message telling her to come into work. **DSUMF 64.** Nearly a month and a half later, in January 2018, Quintana again received a text message instructing her to report to work. **DSUMF 68**.

The content of the communications do not aid Quintana, either. They are "mere offensive utterances" at the very most, if even that. *Torres-Santiago*, 617 F. Supp.2d at 36. Again, Quintana received an e-mail recommending she apply for an open position at a different Army base, a report-to-work text message on the day of an unexcused absence, and an incident in which Quintana was mistakenly asked to report to work while on leave and then told to go home once she arrived. A reasonable trier of fact could not find that these incidents are enough to "alter the conditions of the victim's employment and create an abusive working environment.'" *White*, 221 F.3d at 259. A hostile work environment claim must therefore fail. *Id.*

Besides, the Army has entered evidence into the record articulating legitimate, non-discriminatory reasons for these three incidents, which remain uncontested: (1) Carter said he forwarded the posting because Quintana had expressed numerous times she wanted to leave Fort Buchanan and that she was displeased with her current work, **DSUMF 47**; (2) Quintana was absent from work and was not on preapproved leave nor had notified Scalf she was sick, **DSUMF**s **64-67**; and, (3) Scalf believed, erroneously, that Quintana's leave had concluded on January 3 because of a mix-up with the leave documents, **DSUMF**s **68, 69** and **71**. She has thus failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

For the foregoing reasons, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Sands,* 212 F.3d at 660. Quintana's Title VII hostile work environment claims are **DISMISSED WITH PREJUDICE**.

3.  *Retaliation*

The Army finally moves for summary judgment dismissing Quintana's claims that she was subjected to a fabricated investigation and transferred to a less desirable position as a retaliatory measure in violation of Title VII and the FLSA for having filed a discrimination complaint with the EEOC alleging discrimination on the basis of her national origin. **ECF 1** at 13-14. Quintana indeed filed a national origin discrimination complaint with the EEOC in 2014, that was dismissed in July of 2017. **DSUMF**s **2** and **5**.

A.  *FLSA Retaliation*

Right off the bat, the Court must do away with Quintana's FLSA retaliation claim. "The FLSA anti-retaliation provision protects an employee's lawful efforts to secure rights afforded by the FLSA." *Claudio-Gotay v. Becton Dickinson Caribe, Ltd*, 375 F.3d 99, 103 (1st Cir. 2004). The FLSA establishes minimum wage, overtime pay, recordkeeping, and child labor standards affecting full-time and part-time workers in the private sector and in Federal, State, and local governments. *See generally* U.S. Department of Labor, *Handy Reference Guide to the Fair Labor Standards Act.* It does not, however, cover discrimination on the basis of national origin. *See id.* Because Quintana's 2014 EEOC complaint was premised on national origin discrimination, she

cannot pursue a claim of FLSA retaliation here. *See Claudio-Gotay*, 375 F.3d at 103. Quintana's FLSA retaliation claim is thus **DISMISSED WITH PREJUDICE**.

   B.  *Title VII Retaliation*

   Now, the Court turns to Quintana's Title VII discrimination claims.

   "Title VII's antiretaliation provision forbids employer actions that discriminate against an employee … because [she] has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (cleaned up). A plaintiff may prove that an employer took an action with retaliatory intent through direct evidence or through the familiar *McDonnell Douglas* burden-shifting framework. *See Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018). Here, Quintana has not supplied any direct evidence of retaliatory animus, so her claim must be evaluated through the lenses of *McDonnell Douglas*-tinted glasses.

    Per the burden-shifting framework, "in order to establish a *prima facie* case of retaliation, [Quintana] must show that (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 94 (1st Cir. 2018). After the *prima facie* showing is made, the burden then shifts to the employer to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *See Thermo King*, 585 F.3d at 447-48. If the employer makes this showing, the burden shifts back to

the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but rather a pretext for discrimination. *Id.*

Here, the Court harbors no doubt that Quintana engaged in protected conduct (by filing the 2014 EEOC charge) and will assume without deciding, only for argument purposes, that she was subjected to adverse employment actions. The Court will thus focus its analysis on whether "the adverse employment action is causally linked to the protected conduct." *Id.* Each alleged retaliatory adverse action – namely, two investigations and a transfer, will be addressed below.

With respect to these alleged actions, Quintana can establish a causal connection, as required to build a *prima facie* case of retaliation, either

> (1) indirectly, by showing that the protected activity was followed closely by retaliatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant. A causal connection between a protected action and an adverse employment decision, necessary to establish a prima facie case of Title VII retaliation, may be established by the timing of the adverse employment decision, by evidence that the employer departed from its normal practices, or by evidence that the employer took steps to conceal the reason for its adverse employment action.

Ashworth, Bateman, et al., 21A FEDERAL PROCEDURE § 50:967 (L. Ed.).

> *i. The Investigations*

Following allegations of mismanagement and poor work conditions, the 81st Regional Support Command ("the 81st Command"), based in Fort Jackson, South Carolina, initiated an investigation into Fort Buchanan's FMWR Division in May of 2016. **DSUMF 7.** Dieppa, along

with the FMWR supervisory chain, was one of the subjects of that investigation. **DSUMF 8**.

Upon completion of the investigation, the investigating officer found that Dieppa did "not

always treat subordinates with dignity and respect or foster a healthy command climate" and

that her "authoritative and brash leadership style [had] fostered a toxic work environment."

**DSUMF**s **11** and **12** (*quoting* **ECF No. 94-3** at 13). A follow-up investigation was conducted

afterwards. **DSUMF**s **15** and **16**.

The Army posits that Quintana cannot demonstrate that the investigations were

motivated by a retaliatory animus. Quintana has not made an evidentiary showing in response

that could lead a reasonable trier of fact to infer a *prima facie* causal connection between the

EEOC 2014 complaint and the 2016-2017 investigations. The Army, on the other hand, has

pointed to record materials demonstrating that such a showing is unattainable for Quintana.

The investigations were initiated and conducted by the 81st Command, based in Fort

Jackson, South Carolina – not by Fort Buchannan personnel. **DSUMF 7**; **ECF No. 94-3** at 2-3.

Quintana has not demonstrated that the officers and officials of the 81st Command were aware

of her previous protected activity. One cannot have been motivated to retaliate "by something

[one] was unaware of." *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 402 (D.P.R. 2015), *aff'd*

*sub nom. Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119 (1st Cir. 2017) (*citing Ameen v. Amphenol*

*Printed Circuits, Inc.*, 777 F.3d 63, 72 (1st Cir.2015)). The timing of the investigations in relation

to the protected activity is not necessarily suspect,[21] there is no evidence that the Army departed from its normal practices, or that the employer took steps to conceal the reason for the investigations (instead, the Army's stated reasons for the investigation were set forth in various memoranda). 21A FEDERAL PROCEDURE § 50:967.

Furthermore, there is no showing that Quintana was treated disparately to fellow employees by being subjected to an investigation. *See id.* On the contrary, Quintana was investigated along with two others in the FMWR supervisory chain.[22] **DSUMF 8**; **ECF No. 94-3** at 2-3. And the investigation returned negative results against another supervisor in the FMWR division, too. **ECF No. 94-3** at 11-12. Quintana has not met her burden per the *McDonnell Douglas* burden-shifting framework – a *prima facie* case of retaliation therefore cannot be established.  *See Rivera-Rivera*, 898 F.3d at 94. Plus, it is well settled that the mere fact of engaging in protected activity does not excuse an employee from having to follow the rules and fulfill their duties, nor does it insulate them from warranted employer action and discipline. *See e.g. Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 179 (1st Cir. 2015).

---

[21] Even if it was, it would not be enough. Temporal proximity, by itself, cannot show retaliatory motive. *See Skalsky v. Independent School Dist. No. 743*, 772 F.3d 1126 (8th Cir. 2014). "Although temporal proximity itself is insufficient to establish a causal connection between the protected activity and the alleged adverse employment action, as required to demonstrate a prima facie claim of Title VII retaliation, a temporal connection between the protected activity and the alleged adverse employment action coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." 21A FEDERAL PROCEDURE § 50:967 (citing *Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724 (6th Cir. 2006)).

[22] The Army's actions after the conclusion of the investigation also speak against Quintana's position that the investigation was retaliatory. The Commanding General at Fort Jackson forwarded the findings of the first investigation to the Garrison Commander at Fort Buchanan, who requested a second, follow-up investigation into Quintana's treatment of her subordinates. **DSUMFs 13, 15** and **16**. That follow-up investigation began in late August of 2016 and concluded a little over a moth later, in early October. **DSUMF 15**. Both investigations, though independent, yielded similar results.

Even if Quintana had established a *prima facie* retaliation case, her claim would nevertheless fail in the subsequent steps of the *McDonnell Douglas* burden-shifting framework. To be sure, the Army provided a legitimate non-retaliatory reason for the investigation – that is, responding to allegations of mismanagement levied against the FMWR supervisory chain. **DSUMF 7**; *See also Thermo King*, 585 F.3d at 447-48. Quintana did not rebut the Army's evidence by demonstrating that the employer's purported nonretaliatory reasons for the investigation were not its true reasons, but rather a pretext for discrimination. *Id.* No such attempt was even made. "In a case where the first two steps of the *McDonnell Douglas* pavane have been satisfactorily choreographed, a plaintiff must offer some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." *Mesnick*, 950 F.2d at 825.

### ii. The Transfer

Quintana was involuntary transferred to a less desirable position in November 2017. **DSUMFs 31, 32 36**. She alleges that the transfer was a retaliatory measure. The Army maintains that Quintana cannot show that the transfer was in retaliation for her previous protected conduct in 2014. Indeed, the transfer is even further removed than the investigation, timewise, from the protected conduct. *See* 21A Federal Procedure § 50:967.

Even if Quintana built a *prima facie* case of retaliation (she doesn't), her retaliation claim pertaining to the transfer would nonetheless fail because the Army provided a legitimate non-

retaliatory reason for the transfer which she has failed to rebut by establishing that the purported reason was a pretext to hide a retaliatory animus. *See Mesnick*, 950 F.2d at 825.

The Court has already discussed Quintana's transfer at length. *See supra* at 22-23, 24-27 There, the Court explained that the Army had proffered a non-discriminatory justification for the transfer, and Quintana had failed to establish that the proffered reason was a pretext. *Id.* Quintana's arguments for pretext here are nearly identical to the ones discussed above. *Id.* There is no reason to go into much further detail, save to say that Quintana fares even worse here because the Court has already found that the investigations were not retaliatory. Thus, Quintana fails to meet her burden in the *McDonnell Douglas* burden-shifting framework. *See Strothers*, 895 F.3d at 327.

The Court reminds the reader that Quintana needed to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive," *Santangelo*, 785 F.3d at 70, or proffer record material that evince "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons." *Gómez González*, 626 F.3d at 662-663. Quintana has not come even close to meeting that burden here. Quintana has thus failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452

F.3d 94, 108 (1st Cir. 2006). *See also Mesnick*, 950 F.2d at 825 (failure to provide evidence of pretext at summary judgment stage is fatal).

For all the foregoing reasons, Quintana's Title VII retaliation claims are **DISMISSED WITH PREJUDICE**.

### VI. Conclusion

In accordance with the reasons stated above, the Court **GRANTS** the Army's motion for summary judgment (**ECF No. 93**). All of Quintana's pending claims are accordingly **DISMISSED WITH PREJUDICE**. Judgment shall be entered accordingly.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of September, 2022.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**
